IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| OSF HEALTHCARE SYSTEM, an Illinois not for profit corporation d/b/a SAINT FRANCIS MEDICAL CENTER,<br>　　　Plaintiff,<br><br>v.<br><br>SIVYER STEEL CORPORATION HEALTH CARE PLAN,<br>　　　Defendant. | Case No. 1:14CV01102 |

**Order**

Before the Court is Plaintff OSF Healthcare System's (OSF) Motion for Discovery Authorization (D. 22) and Defendant Sivyer Steel Corporation Health Care Plan's (Plan) response thereto (D. 23). For the reasons stated herein, OSF's Motion is GRANTED.

**I**
**A[1]**

OSF has brought suit against the Plan under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 USC § 1001 *et seq.*, for compensation for medical services OSF rendered to a Plan participant at its St. Francis Medical Center. As alleged in the Complaint (D. 1), the Plan is a health care plan for employees of Sivyer Steel Corporation (Sivyer). The Plan is a self-funded employee welfare benefit plan as defined by ERISA, 29 USC § 1002. Pursuant to the Plan documents, Sivyer also administers the Plan (D. 1-5), although it hired

---

[1] The recitation of facts in this Subsection are taken directly from US District Judge Sara L. Darrow's Order denying the Plan's Motion to Dismiss. (D. 14).

1

Burkwald & Associates, Inc. and United Medical Resources, Inc. (UMR) to administer claims under the benefit plan (D. 22 at ECF p. 2). OSF, as St. Francis Medical Center, is a health care services provider located in Peoria, Illinois.

From on or about July 25, 2012 through August 17, 2012, OSF provided medical services and materials to Francisco Alvarez, a Sivyer employee and Plan participant. Alvarez had been transferred to St. Francis from another hospital because it was not able to provide the level of care required to treat Alvarez's subarachnoid hemorrhage. St. Francis was an out-of-network provider. At St. Francis, Alvarez received medical care at a total cost of $420,578.20. OSF billed the Plan for this amount. The Plan has paid $135,038.88 ($139,442.88 with adjustments) directly to OSF, but has refused to pay the $281,135.32 balance.

In an undated Remittance Advice sent to OSF, the Plan indicated that it was refusing to pay $219,835.32 in "Hospital Miscellaneous" and $60,000.00 in "Hospital Inpatient R&B" because these "Charges [were] in excess of Usual & Customary amounts." (D. 1-7). In a March 29, 2013 letter, OSF demanded payment of the outstanding balance. OSF explained:

> We are unable to accept your request for usual and customary pricing. It is standard practice for all of our Entities to bill according to the guidelines set forth by Medicare. In keeping with that doctrine, we expect the same principles to apply to any party who accept[s] responsibility for claims processing. This letter shall serve as notification of our intent to be paid in full for all billed charges. Non-compliance with this directive will result in added financial responsibility for the patient. Please remit additional payment immediately.

(D. 1-8). UMR replied to OSF's demand for payment by letter on April 25, 2013, informing OSF that the Plan's "adverse benefit determination ha[d] been upheld." (D. 1-9).

2

OSF continued to appeal the Plan's refusal to pay the alleged outstanding balance in letters dated September 26, 2013 and November 14, 2013. Both letters repeat OSF's request for payment of the $281,135.32 balance, assert OSF's beneficiary status under ERISA, 29 USC § 1002(8), and request relevant plan documents. (D. 1-8). Sivyer provided a copy of the Plan's Summary Plan Description (SPD) on November 8, 2013. Id. By letters dated October 4, 2013 and November 22, 2013, UMR reiterated that the adverse benefit determination had been upheld as of April 25, 2013, and directed OSF to review the April 25, 2013 letter for a complete description of the determination. UMR's November 22, 2013 letter further states that all administrative remedies had been exhausted. (D. 1-9). On March 20, 2014, OSF filed the instant lawsuit as a "beneficiary" under ERISA, 29 USC § 1132(a)(1)(B), seeking payment of the balance of Alvarez's treatment, which OSF claims it is owed pursuant to the benefit plan's terms and federal law governing health insurance coverage of out-of-network emergency care (*see* 42 U.S.C. § 300gg-19a(b)(1)(C)(II)).

## B

On March 17, 2015, after the District Judge denied the Plan's Motion to Dismiss, the Court set a Rule 16 Scheduling Conference. At that conference, OSF indicated that it might seek discovery beyond what is contained in the Administrative Record. Based on that representation, the Court ordered the Plan to produce the Administrative Record by June 6, 2015. After receiving that Administrative Record, OSF filed its Motion for Discovery Authorization, and the Plan has now responded. The Motion is therefore ripe for review.

Contained within the Administrative Record is an email exchange between Kyle Pionek and Brian Baxter. (D. 22 at ECF p. 7). Mr. Pionek is a Client Relations Manager with Burkwald & Associates, one of the entities hired by the Plan to make benefit determinations. Mr. Baxter, on the other hand, is a Strategic

3

Account Executive for UMR, also hired by the Plan to make benefit determinations. Mr. Pionek's email indicates that there were two different benefit payment numbers recommended by different administrators. IISI recommended payment of only $135,038.88, while UMR recommended payment of $208,106.26—a difference of around $72,000 according to Mr. Pionek. (D. 22 at ECF p. 7).

> While discussing which of these numbers to use, Mr Pionek states:
>
> However, as part of the conversation, it was determined claimaint generally has no living relatives. This prompted the question as to whether or not the provider [OSF] would even attempt to balance bill the member's estate since the ability to do so would require time, effort and money. It was consensus opinion that the likelihood was slim. Dave Kanarish, Brian Baxter and Kyle Pionek could not think of any other cons to using the lower $135k figure.

(D. 22 at ECF p. 7). Mr. Baxter responded with an indication to proceed processing payment for the lower amount. Id.

Based upon this email exchange, OSF believes the Court should allow it limited discovery in the form of depostions of Mr. Pionek and Mr. Baxter to explore the question of their reasoning as stated in the email exchange, "the benefit determination process, methodology used, and why there is a $72,000.00 difference within their own internal benefit determination as evidenced by the conflict between UMR and IISI's recommended payment." (D. 22 at ECF p. 6). According to OSF, the structural conflict of Sivyer being both the funder and administrator of the benefit plan combined with the email in question is enough for them to overcome the general rule precluding discovery in a case challenging the benefits determination of plan administrators. (D. 22).

The Plan responds that the email is not enough to trigger discovery outside the Administrative Record. The email exchange, according to the Plan,

4

contains a "harmless and irrelevant observation that the hospital might not balance bill the patient" which did not change the fact that the Plan ultimately determined the payment amount by "surveying national databases as recommended by independent professionals hired to perform that calculation." (D. 23 at ECF p. 3). Moreover, the Plan argues that the discovery OSF seeks is related more to the merits of the benefits determination, rather than toward revealing some procedural defect, which is the only discovery allowed even in cases falling under the exception to the general bar on discovery. (D. 23 at ECF p. 4).

## II

As a general rule, where a plan gives discretionary authority to the plan administrator when making a benefits determination, a court's review is limited to that which is contained in the administrative record. *Ryan v Cargill*, 73 F Supp 3d 994, 997 (CD Ill 2014), citing *Perlman v Swiss Bank Corp Comprehensive Disability Protection Plan,* 195 F3d 975, 981-82 (7th Cir 1999). Consequently, no discovery is generally allowable beyond the administrative record. Id. This rule, however, is not absolute.

One area where courts have allowed discovery is where the plan administrator both evaluates claims for benefits and pays benefits claims, present here by the terms of the benefit plan itself. *Cargill*, 73 F Supp 3d at 998. In such cases where this "structural conflict" is present, limited discovery may be permissible in "exceptional" circumstances—circumstances in which the claimant can "identify a specific conflict of interest or instance of misconduct" and "make a prima facie showing that there is good cause to believe limited discovery will reveal a procedural defect." *Cargil*, 73 F Supp 3d at 998, citing *Dennison v MONY Life Retirement Income Security Plan for Employeess*, 710 F3d 741 (7th Cir 2013); *Semien v Life Ins Co of North America*, 436 F3d 805, 815 (7th Cir

2006).[2] Although the Seventh Circuit has not traced out with specificity "the contours of permissible discovery under ERISA," *Dennison*, 710 F3d at 747, district courts in this Circuit have.

For example, in *Warner v. Unum Life Ins. Co. of America,* 2013 WL 3874060, *3 (ND Ill), the court held that discovery is not permitted in the run-of-the mill case and, "[w]hile not an 'onerous' burden, a plaintiff still must identify a specific conflict or instance of misconduct and make a prima facie showing that there is good cause to believe that limited discovery will reveal a procedural defect" before being able to obtain discovery. Id. Applying this standard, the court in *Warner* noted that the plaintiff cited to several facts which allowed it to meet its burden, including the administrator's alleged hostility to the type of disability claim she made and a history of biased claims administration that sparked an investigation of its claims practices by the United States Department of Labor and dozens of state regulatory authorities, which culminated in the administrator paying a multi-million dollar fine and hundreds of millions of dollars to past claimants. Id. These alleged facts met the *Dennison* standard and, therefore, the court allowed limited discovery into the conflict question.

On the other hand, using the same "run-of-the-mill" standard articulated in *Warner,* the court in *Boxell v Plan for Group Ins of Verizon Communications, Inc,* 2013 WL 5230240, *5 (ND Ind), declined to allow conflict discovery. The court noted that the plaintiff "has not identified a specific conflict or instance of misconduct or made a prima facie showing that there is good cause to believe that limited discovery will reveal a procedural defect." Although the plaintiff

---

[2] Although the Supreme Court's decision in *Metropolitan Life Ins Co v Glenn*, 554 US 105 (2008), caused some courts to question the continued validity of the conflict discovery exception, the Seventh Circuit in *Dennison* made clear that the exception survived *Glenn*. See *Cargill*, 73 F Supp at 999 (discussing in detail the how the court in *Dennison* interpreted the impact of *Glenn* on the discovery exception).

might have disagreed with the plan administrator's conclusion, "that does not equate to even a preliminary showing of misconduct, bias, or conflict of interest that might warrant discovery beyond the record on which the administrator relied," the court concluded. Id. Likewise, the court in *Gebert v Thrivent Financial for Lutherans Group Disability Income Ins Plan,* 2013 WL 6858531 (ED Wis 2013), applying the "run-of-the-mill" test, also declined to allow conflict discovery. Distinguishing the facts in the case from those in *Warner,* the court noted that in *Warner* the requisite showing was made due to the documented history of bias on the part of the plan administrator. The plaintiff in *Gebert,* however, like the plaintiff in *Boxell,* had no such similar facts to direct the court, and therefore lacked the "key to open the door to additional discovery that is not permitted in the typical case." Id at *2.

Looking to these cases as a guide for applying the *Dennison* standard, this Court in *Cargill* noted that it is necessary to "balance the interest in not subjecting benefits review officers 'to extensive discovery on a thinly based suspicion that their decision was tainted by a conflict of interest,' *Dennison,* 710 F3d at 746, citing *Marrs v. Motorola, Inc,* 577 F3d 783, 787 (7th Cir 2009), against the need for information for courts to 'weigh' regarding the impact of a structural conflict of interest. *Glenn,* 554 US at 115-16." *Cargill,* 73 F Supp 3d at 1001. In *Cargill,* the Court found that the balance of these interests favored limited discovery, especially in light of the court in *Dennison*'s statement that "trial courts retain broad discretion to limit and manage discovery under Rule 26 of the civil rules." *Cargill,* 73 F Supp 3d at 1001, quoting *Dennison,* 710 F3d at 747. Specifically, the defendant in *Cargill* asserted in a letter to the plaintiff that it "had consistently administered" the plan such that individuals similarly situated to the plaintiff were denied the benefit in question. The Court concluded that this statement was enough to warrant limited discovery. Id at 1002.

In reaching this conclusion, this Court found that the statement "opened the door" to discovery on the question, for the statement stood as the only evidence in the record on the question of consistency of interpretation under the plan. Id at 1001. Without discovery, the plaintiff had no opportunity to test the veracity of the statement, making it fundamentally unfair to allow the defendant in that case to inject the question into the administrative record, while being shielded from providing evidence to support the claim. Id. Accordingly, the Court concluded the statement was enough to bring the case out of the "run of the mill" and therefore allowed discovery on whether the statement was in fact accurate. Id at 1002.

### III

Turning to the case at hand, Sivyer both funds and administers the benefit plan, which presents the type of structural conflict that could warrant discovery if, under the standard set forth above, OSF can establish that this case is not a "run of the mill" structural conflict case by: 1) identifying a specific conflict or instance of misconduct; and 2) making a prima facie showing that there is good cause to believe that limited discovery will reveal a procedural defect." (D. 1-5); *Warner* at *3.

The specific instance of misconduct to which OSF directs the Court is the email exchange set forth, *supra*. According to OSF, this email demonstrates that the Plan considered impermissible factors when deciding how and to what extent to pay on the claim in question, and they should at least be allowed discovery to explore the issue further. The Court agrees. The Plan does not even attempt to argue that the consideration of whether OSF would actually take the time to "balance bill" the member's estate was somehow a permissible consideration in evaluating the claim. Nor does the SPD submitted by the

Defendant make any allowance for consideration of such a question. (D. 23-1 at ECF pp. 4-18).

Rather, the email suggests that the plan administrators were considering *business* factors related to how little they could pay without negative consequence. That portion of the email discussion had nothing to do with making an appropriate determination of what the plan documents required the Plan to pay to OSF; it was an overt reference to paying as little as possible without too many "cons." (D. 22 at ECF p. 7). This type of conduct is precisely why limited discovery is allowed in cases where a specific instance of misconduct like this can be identified by a plaintiff. The type of inherent structural conflict in a plan funded and administered by the same entity creates a possibility that the plan "funder" will be tempted to administer the plan in a way to illegitimately minimize its payment obligations because of the self-interest the "funder" has in doing so. The email here at least raises the distinct possibility that such occurred in this case, entitling OSF to limited discovery to explore the question.

This conclusion is bolstered by the fact that the email indicates that the reference to paying a reduced amount because OSF would not seek to "balance bill" is more than a "harmless and irrelevant observation" made by the email's author, as the Plan asserts. (D. 23 at ECF p. 6). The email specifically notes that the "balance bill" question was part of a "conversation" had among plan administrators. (D. 22 at ECF p. 7). This issue was not some passing reference made in an email by a lone Client Relations Manager; it was part of a larger conversation among the plan administrators as the email suggests. Id. Indeed, the email can be read as evidence that the lower of the two payment amounts was selected based solely upon the fact that OSF would be unlikely to "balance bill" the participant's estate; a supposition which should have no place in a

9

determination of the benefit under the Plan. As such, OSF is entitled to discovery to explore just how much of a role this issue played in the Plan's decision to pay what it did.

Finally, the discovery requested has the potential to reveal a procedural defect, rather than just information related to the merits of the benefits determination. Insight into the conversation had among the plan administrators has the potential to reveal to what extent, if any, impermissible factors were considered in the process. Likewise, discovery related to the benefit determination process, methodology used, and the $72,000.00 difference within the internal benefit determination will allow OSF and the Court to evaluate whether, how, and to what extent the claim determination process was influenced by any self-interest on the part of Sivyer in funding and administering the Plan. This is precisely the type of discovery envisioned by *Dennsion* and its progeny.

Importantly, the Court makes no finding regarding the ultimate impact of the email in question on the merits of this case. That question is for later. The Court now finds only that the email has provided the "key to open the door to additional discovery that is not permitted in the typical case." *Gerbert* at *2.

## IV

For the reasons stated herein, the Court GRANTS OSF's Motion for Discovery Authorization. (D. 22). Accordingly, OSF may take the depositions of Kyle Pionek and Brian Baxter to explore their reasoning as stated in the February 22, 2013 and February 25, 2013 emails, the benefit determination process, methodology utilized, and why there exists a $72,000.00 difference between the internal benefit determinations made by UMR and IISI. Said depositions shall be completed on or before September 9, 2015. Any motion for additional discovery based upon those depositions shall be filed on or before October 7, 2015.

*It is so ordered.*

Entered on August 13, 2015

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE